**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Michels Corporation,<br><br>    Plaintiff,<br><br> v.<br><br>Central States, Southeast and Southwest Areas Pension Fund; and Arthur H. Bunte, Jr., as Trustee,<br><br>    Defendants. | No. 12-cv-4144<br><br>Judge Norgle<br><br><br>**MICHELS CORPORATION'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT** |
| Pipe Line Contractors Association,<br><br>    Intervening Plaintiff,<br><br> v.<br><br>Central States, Southeast and Southwest Areas Pension Fund, *et al.*,<br><br>    Defendants. | |
| Central States, Southeast and Southwest Areas Pension Fund, and Arthur H. Bunte, Jr.,<br><br>    Counterclaim Plaintiffs,<br><br> v.<br><br>Michels Corporation,<br><br>    Counterclaim Defendant, and<br><br>Apex Pipeline Services, Inc., *et al.,*<br><br>    Additional Counterclaim Defendants. | |

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

The collective bargaining agreement between the Pipe Line Contractors Association (the "PLCA"), a multi-employer bargaining representative, and the International Brotherhood of Teamsters (the "IBT") (together the "Bargaining Parties") provided that Plaintiff, Michels Corporation ("Michels"), among others, would make monthly contributions to the Central States Southeast and Southwest Areas Pension Fund (the "Fund") through January 31, 2011.

The PLCA gave proper and timely notice to the IBT that it would not renew that agreement. The Bargaining Parties continued negotiations, along with several extensions of the terms of their prior agreement, the last of which expired on November 15, 2011.

During those negotiations, and as early as May, 2011, the PLCA advised the Fund that a withdrawal from the Fund was imminent. The Fund realized that the Bargaining Parties were going to agree to a withdrawal during calendar year 2011, and that they had the right to do so. The Fund further realized that if the expected withdrawal could be delayed until calendar year 2012, the withdrawal liability of the PLCA members to the Fund would be substantially greater.

The Fund therefore decided to try to prevent the Bargaining Parties from effectuating that withdrawal. To accomplish this, the Fund repeatedly refused and evaded requests from the PLCA as to the form of documenting and communicating to the Fund the Bargaining Parties' agreement in a manner the Fund would deem to be acceptable. In the face of this evasion, the Bargaining Parties documented and communicated their agreement in a clear and reasonable manner on November 16, 2011. The PLCA then requested, on eight additional occasions, that the Fund confirm that this method was acceptable to the Fund, and the Fund ignored all those communications. Then, in early 2012, when it would be too late for any alleged deficiency in the

method to be corrected in 2011, the Fund announced its interpretation: that the relevant plan documents required a different method of documentation, thus claiming that Michels and other PLCA members did not effectively withdraw in 2011.

Michels, one of the affected PLCA members, filed this lawsuit seeking declaratory relief, and moved for summary judgment on the grounds that the withdrawal of November 15, 2011 was indeed effective, based on the plain meaning of the pertinent documents. *See* Memorandum in Support of Motion for Summary Judgment (Doc. No. 137). Defendants responded (per the parties' agreed amended scheduling Order, as entered by the Court (Doc. No. 148), with Counterclaim Plaintiffs' Combined Memorandum in Support of Their Cross-Motion for Summary Judgment and Response to Counterclaim Defendants' Motion for Summary Judgment. (Doc. No. 153). Defendants' filing makes two separate arguments. First, they argue that the November 15, 2011 withdrawal was ineffective, based on pertinent documents. Defendants argue that for that reason, Michels' Motion for Summary Judgment should be denied, and that for exactly the same reason, Defendants' Cross-Motion for Summary Judgment should be granted. Per the agreed scheduling Order, Michels will be filing its reply memorandum in support of its motion for summary judgment on March 29, 2013, responding to this argument.

Second, Defendants argue that the equitable defenses Plaintiffs have raised based on the Fund's deceptive conduct, briefly summarized above, should be dismissed because (a) equitable defenses "do not exist" under ERISA, (b) any misrepresentative conduct from the Fund was not in writing, (c) any reliance was unreasonable, and (d) the Fund had no duty to respond to inquiries. (*See* Doc. No. 153, at 17-18).

Significantly, the Defendants do not argue that the equitable defenses fail due to the absence of evidence of a scheme by the Fund to mislead Michels and other PLCA members.

Were Defendants to do so, Michels would seek leave pursuant to Federal Rule 56(d) to demonstrate the existence and particulars of such a scheme.  Instead, the Defendants argue that the absence of a written misrepresentation, and certain legal arguments, cause the equitable defenses to fail *even if* the Fund deliberately set about to mislead Michels and the other PLCA members.  As such, the factual discussion below only generally summarizes the evidence of the Fund's inequitable conduct, in a manner for the Court to see the factual context of the Defendants' arguments.

As is explained below, Defendants' arguments do not warrant dismissal of the equitable defenses.  The relevant legal principles do not give the Fund blanket permission to engage in deliberately deceptive conduct, even in the absence of a fiduciary duty, so long as they avoid communicating their deception in writing.  Nor was it unreasonable for the PLCA to rely on its expectations that (a) its clear, written communication of the Bargaining Parties' agreement would be sufficient to constitute proper notice, when the Fund refused to provide any information as to the form of documentation it sought, and (b) the Fund would notify it of any objection to that form of documentation upon request.  Surely, in the seven weeks between November 16, 2011 and December 31, 2011, the Fund could have determined whether it had any objections to the clear written notice it received from PLCA members. Thus, even if the Court were to deny Michels' Motion for Summary Judgment and conclude that the pertinent documents favor the Fund's interpretation, the Court should deny Defendants' Motion for Summary Judgment such that the parties would commence discovery and litigate the factual basis of these equitable defenses.[1]

---

[1] If Michels' Motion for Summary Judgment is granted, Defendants' Motion for Summary Judgment would become moot because Michels would no longer need to rely on equitable defenses.

## II.    FACTS[2]

### A.    Background and 2010-2011 Collective Bargaining Negotiations

Michels, a pipeline contractor, is a member of the PLCA, an association which negotiates a collective bargaining agreement with the IBT on behalf of PLCA's members.  SAMF ¶ 1.  In February 2006, the IBT National Pipe Line Agreement (the "2006 CBA") was executed.  SAMF ¶ 2.  The parties to the 2006 CBA included the PLCA, the IBT, Michels, and other pipe line contractors.  SAMF ¶ 2.  Michels explicitly agreed to be bound by the 2006 CBA. SMF ¶3.  In addition, as a PLCA Labor Committee member, Michels automatically became bound to any negotiated agreement between the PLCA and the IBT because the PLCA By-Laws so state.  See Docket No. 139 (Michels' Rule 56.1 Statement – "SMF") ¶11, citing Answer to PLA Complaint at ¶8, admitting the fact.  Moreover, the PLCA has a long-standing and universally known and observed custom that all of its members are bound by the PLCA's collective bargaining agreements.  SAMF ¶ 4.  Further, by becoming a bargaining committee member, not only did Michels agree to work under any negotiated agreement, it was very closely involved with the collective bargaining process.  SAMF ¶¶ 5-6.  Michels adhered to all the applicable agreements, for example, by making contributions to the Fund during the 2006 CBA and the period of the first eight extension agreements in 2011. SAMF ¶ 7.  Therefore, Michels explicitly agreed to be bound by the 2006 CBA, and through its conduct, manifested the unequivocal intention of being bound by agreements between the Bargaining Parties.  *See Moriarty v. Glueckert Funeral Home*, 155 F.3d 859, 867 (7th Cir. 1998).

The 2006 CBA, through its Schedule A, lists a Fund contribution amount to be made per covered employee per hour for specified time periods, all of which end by February 1, 2011. SAMF ¶ 8.  Schedule B is a Participation Agreement with the Fund, which in turn is a

---

[2] References to numbered paragraphs of Michels' Statement of Additional as "SAMF ¶ ____".

multiemployer pension plan within the meaning of ERISA. SAMF ¶ 8. The Trustees of the Fund have adopted a Fund Trust Agreement and purportedly have reserved to themselves the right to interpret the Fund Trust Agreement. SAMF ¶ 9.

On August 9, 2010, the PLCA notified the IBT both of its intention to terminate the 2006 CBA on January 31, 2011 and its desire to meet to negotiate a new agreement. SAMF ¶ 12. The August 9, 2010 letter was sent more than sixty days prior to January 31, 2011, and complied with the notice of termination requirement set forth in Article XV(C) of the 2006 CBA and Section 8(d) of the National Labor Relations Act, 29 USC 158(d) ("NLRA").[3] SAMF ¶ 13. The Bargaining Parties later agreed, via a series of letters, to extend the terms of the 2006 CBA until November 15, 2011, while negotiations continued. SAMF ¶ 14.

### B. The Fund's Scheme To Delay Withdrawal Until 2012

As early as May 2011, the principal administrators and counsel of the Fund ("Fund Agents") were aware that withdrawal from the Fund was a topic of the negotiations. SAMF ¶ 17. When an employer permanently ceases having an obligation to contribute to the Fund, the Fund assesses withdrawal liability pursuant to Section 4201 et seq. of ERISA, 29 U.S.C. §1381 et seq. Withdrawal liability increased substantially for withdrawals in 2012 as compared to 2011, and during the pertinent period discussed below, the Fund Agents were well aware that this was likely to occur. SAMF ¶¶ 10, 16.

The Fund, realizing this, deliberately set out to mislead the PLCA into effectuating the withdrawal in a manner which the Fund would later claim was unacceptable. The Fund did this to prevent the Bargaining Parties from effectuating the agreement that they clearly had the right

---

[3] In the Doc. No. 150, in their response to SMF ¶23, Defendants inexplicably deny that the citation supports the assertion that the notice of termination complied with the CBA. The citation incudes the page of the CBA which requires written notice to terminate more than sixty days prior to January 31, 2011, and the fact that the written notice was sent on August 9, 2010, which is more than sixty days prior to January 31, 2011. No additional citation is needed.

to make, so that the liability of the affected employers would be greatly increased beyond what would have been the case if their agreement were implemented.

The chronology summarizing many of the communications which constituted the Fund's deception are set forth in SAMF ¶¶ 17 - 34. Very briefly, in September 2011, the PLCA repeatedly asked the Fund for its position as to how notice of withdrawal should be given. SAMF ¶¶ 18-22. The first time, the Fund ignored the question. *Id*. The second time, it vaguely indicated that the answer could be found in the Participation Agreement, but in fact, nothing in the Participation Agreement provides such information. *Id*. The PLCA pointed this out, and asked for anything else that would useful, but the Fund ignored this request. *Id*.

The PLCA and IBT ultimately agreed, on November 14, 2011, that Michels and all other participating employers would cease to make contributions to the Fund after the expiration of the last extension agreement on November 15, 2011. SAMF ¶¶ 23-24. In determining the appropriate manner to document this agreement and notify the Fund, the Bargaining Parties were faced with the refusal of the Fund Agents, the very individuals who operate the Fund on a day-to-day basis, to state their viewpoint on how the Fund wished for them to proceed, as well as the absence of any document (Participation Agreement, Fund Trust Agreement, or otherwise) providing that information. SAMF ¶ 22.

The Bargaining Parties therefore executed the November 15, 2011 CBA, as a clear, plain-language statement of the Bargaining Parties' substantive agreement to terminate Fund contributions but to renew all other provisions of the 2006 CBA, and promptly provided it to the Fund, in accordance with the simplest, common sense interpretation of the notification requirements contained in the Trust Agreement. SAMF ¶¶ 23-24.

The PLCA notified the Fund of the November 15, 2011 CBA, in writing, on November

16, 2011 and thereafter – repeatedly, clearly, and emphatically. SMF ¶¶ 24-32. On <u>eight</u> additional occasions, the PLCA asked the Fund promptly to identify any objection it may have had to the manner the Bargaining Parties had documented the agreement to terminate of the contribution obligation. SAMF ¶¶ 25-32. The PLCA emphasized the importance of addressing any concerns by December 31, 2011. SAMF ¶¶ 24, 25, 28. Suspecting the scheme to push the withdrawal date into calendar year 2012, the PLCA even accused the Fund, after its fourth letter had been ignored, of deliberately withholding an objection until after December 31, 2011. SAMF ¶ 28.

The accusation was well founded, for the Fund did just that. After ignoring these many communications for many weeks, on January 30, 2012, the Fund finally responded, taking the position that the PLCA contractors still were required to contribute to the Fund after November 15, 2011, despite the Bargaining Parties' clear agreement to the contrary and notice to the Fund. SAMF ¶¶ 33-34. Apparently, the Fund takes the position that the November 15, 2011 CBA should have contained the title, "Collective Bargaining Agreement," and the PLCA should have re-typed the terms of the 2006 CBA and modified it where so agreed, rather than referencing the 2006 CBA. While discovery would show the full detail of the above-described scheme, SAMF ¶¶ 17 – 34 provides a summary of many of the key communications.

The Fund subsequently went one step further, contending in this litigation that it has the right to deferential review. SAMF ¶ 9. Thus, the Fund argues that it has the right to: (a) create a Plan document that omits the Fund's theory of how a party may effectuate a particular right; (b) interpret the document it created in a strained (at best) manner that limits how a party may effectuate that right; (c) refuse to tell the party, even when the party asks, repeatedly, which interpretation the Fund will utilize in deciding whether the party properly effectuated the right;

and (d) argue that the party forfeited the right due to its "failure" to follow the Fund's undisclosed interpretation.

## III.    ARGUMENT:  DEFENDANTS' MOTION SHOULD BE DENIED

Defendant's Motion does not argue that the undisputed facts yield no inference of such a deceptive scheme, discussed above.  Rather, Defendants argue that even assuming that such a deceptive scheme existed, no equitable defense would prevent the Fund from succeeding in that scheme.  That simply cannot be and is not the state of the law, as is discussed below.

### A.    The Applicable Summary Judgment Standard

Summary judgment procedure provided for in Federal Rule of Civil Procedure 56(c) "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules*."  See Celotex Corp. v. Catrett*, 447 U.S. 317, 327, 91 L.Ed.2d 265 (1986).  However, "[i]n determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party."  *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 394 (7th Cir. 1998).

### B.    Equitable Defenses Are Available

The Fund boldly states that equitable defenses "do not exist" in relation to ERISA lawsuits.  The Fund is mistaken.  The Seventh Circuit has recognized equitable claims and defenses in the ERISA context.  For example, in *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 818 (7th Cir. 2010), the Seventh Circuit addressed the equitable defenses of unclean hands and laches, as asserted by a party who was not a participant, beneficiary or fiduciary.  The Court determined that the equitable reformation of an ERISA plan was appropriate.

Even before the *Young* decision, the Seventh Circuit endorsed the concepts of equitable

estoppel and laches in a case that did not involve any writing from the applicable fund. In *Teamsters & Emplrs Welfare Trust v. Gorman Bros. Ready Mix*, 283 F.3d 877, 883 (7th Cir. 2002), the Seventh Circuit found that the employer's defense of equitable estoppel failed "not because ERISA bars such a defense, but because its elements have not been proved." In so holding, the Seventh Circuit indicated that an estoppel claim against a multi-employer pension plan may succeed ". . . where estoppel is sought on the basis of words or conduct by a responsible official of the plan itself." *Id*. at 883-84.

Thus, the Fund's broad claims that equitable defenses do not exist under ERISA, or must be limited to claims based upon a writing from the Fund, are misplaced. The two cases they cite to the contrary predate the binding precedents cited above. *Coker v. Trans World Airlines,* 165 F.3d 579, 585 (7th Cir. 1999), the decision the Fund claims requires that any estoppel claim be supported by a writing, is post-dated by *Young* and *Gorman Bros. Ready MixIn*. Similarly, *Cent. States, Se. & Sw. Areas Pension Fund v. Kabbes Trucking Co*., Case No. 02 C 1809, 2004 U.S. Dist. LEXIS 23558 (N.D. Ill. Nov. 18, 2004), decided prior to *Young*, also would be inapplicable even if indistinguishable, in light of *Young* and *Gorman*. In any event, *Kabbes* is distinguishable because there, the court noted that equitable defenses may not resonate with Congress' intent to protect employees while ensuring the financial integrity of welfare or pension funds. There, the employer sought to avoid making contributions that were required by the applicable collective bargaining agreement and relied upon by the Fund. *Id*. at 68-70. Here, in contrast, the equitable defenses arise where Michels and other PLCA members, at a minimum, had the right to stop making contributions provided that they properly effectuated notice. The *Kabbes* court's concerns are inapplicable here.

**C.     The Equitable Estoppel Defense Has Merit Under The Present Facts, Resolving Reasonable Factual Inferences In Favor Of The Non-Movants**

Plaintiff contends that the Fund, knowing that a withdrawal in 2011 by the Bargaining Parties was imminent, and knowing that the Bargaining Parties had the right to do this, deliberately set out to mislead the PLCA into effectuating the withdrawal in a manner which the Fund would later claim was unacceptable. The purpose of this scheme was to delay the relevant withdrawal date into 2012, rather than 2011 as the Bargaining Parties had agreed, so that the affected employers' liability would be much greater than if the Bargaining Parties' agreement to a withdrawal date in 2011 were given substantive effect.

To accomplish this, the Fund, having created a Plan document that omits any recognizable statement of its own theory of how a party may effectuate a right to withdraw: (a) came up with a strained interpretation of the document that unnecessarily limits how a party may effectuate that right; (b) refused to tell the party its interpretation, even when the party repeatedly asked, (c) when the party then implemented a reasonable and clear method of notifying the Fund of its exercise of the right, and repeatedly asked the Fund whether it had any concerns, refused to respond, (d) refused to respond in order to prevent the party from modifying its method of notification to conform to the Fund's undisclosed requirement; and (e) then argued that the party forfeited the right due to its "failure" to follow the Fund's undisclosed interpretation. A summary of the key communications in this regard is at SAMF ¶¶ 17 – 34.

Contrary to the Fund's assertion, the Courts may estop the Fund from succeeding in such a scheme. The same Fund at issue in this case was equitably estopped from preventing an employer from initiating a withdrawal liability arbitration where the Fund failed to correct the employer's mistaken belief that its request for arbitration was timely. *Central States, Southeast & Southwest Areas Pension Fund v. Premarc*, No. 94 C 1927, 1994 U.S. Dist. LEXIS 11726

(N.D. Ill. Aug. 22, 1994). In *Premarc*, the employer received a demand for payment of withdrawal liability from the Fund and requested that the Fund review this determination. The Fund provided a response to the employer's law firm. The law firm received the response, but apparently lost it in the mailroom, and the responsible decision-makers were unaware of it. Under the statute, the employer's 60 day period to demand arbitration would have commenced 120 days after its request for review if it did not receive a response from the plan, but immediately once the employer received such a response.

Believing (incorrectly) that the Fund had failed to respond, the employer sent a follow-up letter seeking a response to the original request, and advised the Fund that unless a response was received, the employer would initiate arbitration proceedings within the 60 days after the 120th day. The Fund acknowledged receipt of the letter, but declined to correct the employer's mistaken belief that a response had never been sent, later explaining – much like this case – that it was under "no duty to speak." The court concluded that the Fund's silence "constituted active concealment for the purpose of preventing [the defendant] from initiating arbitration proceedings in time." The court accordingly determined that the Fund was equitably estopped from asserting that the employer's arbitration demand was untimely.

Despite the court's ruling in *Premarc*, the Fund continues to act in a manner that the *Premarc* court deemed to be improper. In *Premarc*, the Fund was estopped because it knew that the employer had the right to appeal, provided that it followed the correct procedural steps. The Fund further knew that the employer was about to make a procedural misstep due to a factual misunderstanding. The Fund failed to correct the misunderstanding, and then relied on the procedural misstep to try to block the employer from exercising that right.

Similarly, here, even if one construes the November 15, 2011 CBA as a procedural

"misstep" (which, of course, is emphatically denied) as in *Premarc*, the Fund acted deliberately to avoid advising the PLCA of the alleged misunderstanding. Just like *Premarc*, the Fund's principal excuse for not notifying Michels was that it had no duty to respond. The Fund does not even attempt to explain why it did not alert the Bargaining Parties that it would be interpreting relevant plan documents against their known objective – a 2011 withdrawal. In the event that summary judgment is not granted to Michels, it should be permitted to conduct discovery to prove that the Fund's inaction amounted to the "active concealment" prohibited by *Premarc*.

The Fund's conduct here was far more extreme than in *Premarc*. First, in *Premarc*, the Fund failed to correct a misunderstanding indicated in a single letter. Here, the Fund ignored at least <u>twelve</u> requests over a four month period (in addition to the November 16, 2011 Letter, three times before that letter and eight times after it). This shows a far more deliberate and extreme course of conduct. Second, the Fund here created the very problem at issue. Having created a cumbersome plan document and purportedly reserved for itself the right to interpret it, the Fund then refused to tell the PLCA what its interpretation was. It then relied on this undisclosed interpretation to argue that the PLCA misstepped procedurally. This goes far beyond the conduct in *Premarc*, which was enough to warrant application of the equitable estoppel defense.

Additionally, the Fund defends itself by claiming that Michels could not have reasonably relied on its silence given Michels' access to the very same documents that the Fund now asserts precluded a 2011 withdrawal. Of course, this argument directly contradicts the Fund's assertion that its plan interpretation is entitled to deference, an argument which inevitably assumes that interpretation is needed. Michels had access to the documents, but not the interpretation.

In any event, *Premarc* implicitly rejects an even stronger argument, for in *Premarc*, the

employer, as an entity, "knew" that it had received a response, but the employer nonetheless was entitled to rely on the Fund's failure to correct the employer's belief that it had not received a response. Similarly, here, the PLCA was entitled to rely on the Fund's failure to "correct" the employer's indication on November 16, 2011 that it believed that it had properly provided any required notice, particularly when one adds the many other communications to the Fund and the Fund's recalcitrance.

Indeed, the PLCA reasonably could construe the Fund's silence as "acceptance" of the November 15, 2011 CBA. The Fund maintains that it "accepted" the various extension agreements between February 1, 2011 and November 14, 2011 by silently depositing subsequent payments it received but never explicitly stating its acceptance. SAMF ¶15. It follows that its failure to object (for over 45 days) to the November 15, 2011 CBA could reasonably be construed as "acceptance" of an agreement that called for cessation of the obligation to contribute.

In sum, Michels' equitable estoppel claim cannot be barred simply because the Fund remained silent during the crucial months.

### D. The Fund's Request For Deferential Review Highlights The Applicability Of An Equitable Estoppel Defense

The Fund itself highlights the need for an equitable defense, in asking the Court for deferential review of its interpretation. The Fund remained silent when they were planning to advance an interpretation of the documents that was contrary to common sense, defeated the intent of the parties to the CBA, and required a convoluted procedure that was nowhere specified in the documents. Even if the Plan were otherwise permitted to proceed in this way, equity prohibited them from concealing their extraordinary interpretation of documents they had themselves drafted and claimed the right to interpret in the face of so many requests for

clarification.  *See Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 588 (7th Cir. 2000) ("The appropriateness of applying estoppel in this case becomes even more clear when we take into consideration . . . that the Plan, through its own actions, reinforced the confusion created by its own documents . . ."). Note that contrary to Defendants' assertion that a writing is needed, there was no written misrepresentation in *Premarc* or *Bowerman*.

While not a separate cause of action, the covenant of good faith and fair dealing is informative in this context, as it,       ". . . applies as a method by which gaps in the contract are filled.  Its application is limited to instances in which a party is given discretion in enforcing certain provisions of the contract." *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 579 (7th Cir. 1995) .  Thus, for example, in *Jordan v. Duff*, 815 F.2d 429, 438 (7th Cir. 1987), the Court explained that, "The element of good faith dealing implied in a contract 'is not an enforceable legal duty to be nice or to behave decently in a general way. . . .  Avowedly opportunistic conduct has been treated differently however . . ."

Here, to the extent that the Court concludes that any interpretation of the relevant documents is warranted, to determine how the Bargaining Parties should have documented the agreement that they clearly had the right to make, equity would preclude the Fund from the opportunistic conduct of withholding its interpretation in the face of repeated requests.

## IV.    CONCLUSION

The Fund cannot escape the equitable estoppel defense simply based on the assertions it advances in its motion.  Rather, it would need to prevail by rebutting the factual assertions stated herein, and as such, its motion for summary judgment against the defense should be denied.  For the reasons stated above, Michels respectfully requests that Defendants Motion for Summary Judgment be denied.

-14-

Respectfully submitted,


By: /s/ David K. Haase
            David K. Haase

David K. Haase
Michael G. Congiu
LITTLER MENDELSON, P.C.
A Professional Corporation
321 North Clark Street, Suite 1000
Chicago, IL 60654
312.372.5520

Susan K. Hoffman
LITTLER MENDELSON, P.C.
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102
267.402.3015

*Attorneys for Plaintiff*
*Michels Corporation*

Dated: March 15, 2013

## CERTIFICATE OF SERVICE

I, Michael G. Congiu, an attorney for Michels Corporation, hereby certify that on March 15, 2013, I electronically filed ***Michels Corporation's Response to Motion for Summary Judgment*** using the CM/ECF filing system which will send such notification to the attorneys of record in the above-captioned litigation.

/s/ Michael G. Congiu
Michael G. Congiu

Firmwide:118961131.2 067561.1003
3/15/13